IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 2:23-cr-20032-JPM ) ) |
| LEROY CLOYD, | ) ) |
| Defendant. | ) ) ) |

**PROPOSED FINDING OF FACTS AND CONCLUSIONS OF LAW AS TO CERTAIN SENTENCING FACTORS**

The PSR and the audio tapes of **Cloyd** in the undercover investigation support the propositions (1) that **Cloyd** was an organizer, leader, manager, or supervisor over at least one other participant in the sale of "switches" to the UCA (Under Cover Agent); (2) that **Cloyd** provided false information to the Probation Officer and the Court regarding his role in the offense conduct and thus obstructed justice; (3) and that **Cloyd** should not receive a reduction for acceptance of responsibility.

**I.   DETERMINING CLOYD'S ROLE**

In the first transaction, the UCA initially contacted Johnson but Johnson indicated, in paragraph 10, on June 1, 2022 "that the supplier would not arrive in Memphis until the following day."  Johnson had previously discussed with the UCA the price of the switches/MCD's setting a price of $200.00 for a plastic MCD and $500.00 for a metal MCD.

Significantly, on June 1, 2022, Johnson, having indicated that supplier would not arrive in Memphis until the following day, said he was "attempting to locate other individuals" who could sell MCD's to the UCA.

Five days later on June 6, 2022, the UCA called Johnson to arrange a meeting.  Johnson reported that "the supplier" had three MCD's for the UCA.  When the UCA advised that he would call Johnson to meet the following day, Johnson responded that he was traveling out of town and instructed the UCA to contact "the supplier" to purchase the MCD's.  Johnson then

1

provided to the UCA the telephone number for LeRoy **Cloyd**.  Thus, it appears that **Cloyd** was "the supplier" identified by Johnson.

A short time later, on June 6, 2022, **Cloyd** actually called the UCA and said that he had two MCD's reserved for the UCA.  **Cloyd** advised he lived in Texas and travels.  When the UCA asked **Cloyd** if he could obtain an MCD for an AR-15, **Cloyd** responded that he had sold one to his uncle.  As to the MCDs to sell to the UCA, **Cloyd** "reviewed the bus schedule" and they agreed to meet the following day, June 7, when **Cloyd** ("the Supplier") would have two plastic MCDs waiting for the UCA and a metal MCD.  They agreed to meet the following day.

On June 17, 2022, the UCA called **Cloyd** and, eventually, they made contact.  They agreed to meet at the shopping center at 2715 S. Perkins Road.  The UCA and **Cloyd** exchanged telephone calls, etc., regarding **Cloyd's** arrival to the meeting.  **Cloyd** advised he would be in a red car, etc.  Shortly thereafter, the UCA received a call from **Cloyd**.  **Cloyd** obtained the description of the UCA's vehicle and then the UCA saw a blue Ford Mustang occupied by two individuals approach the UCA's location.  **Cloyd**, who had been in the driver's seat, exited the vehicle and another person, Jordan Proctor, entered the driver's seat and then drove away in the Mustang.  **Cloyd** approached the UCA, they met, and **Cloyd** had an MCD with him.

It is correct that **Cloyd** then asked the UCA to contact Johnson, the call was put on the speaker phone, **Cloyd** confirmed that Johnson thought the UCA was "straight" and **Cloyd** then "instructed Johnson to text his telephone number."  **Cloyd** also produced two MCD's for the UCA.  The agent asked the price and **Cloyd** said he wanted $250.00 but the UCA said they had agreed to $200.00.  **Cloyd** then set the price by agreeing to the $200.00 amount.  The UCA agent then handed **Cloyd** $400.00.  The $400.00 amount is important because it is the proceeds of the sale and, it subsequently appears, that **Cloyd** retained all the money (**Cloyd** did not split it with Johnson or anyone else).  It should also be noted that **Cloyd**, as reflected in paragraph 16, received a call from the UCA in which he "informed the UCA that he had cell phones, Apple watches, and "switches" for sale."  **Cloyd** also indicated that he would charge $250.00 for an AR-15 MCD.  Thus, **Cloyd** was setting the sale price for items such as the AR-15 MCD and he was further identifying himself as "the supplier" as referenced in the earlier conversations between the UCA and Johnson.

This concluded the first sale and the conversations related to that sale.

In connection with the second sale, in paragraph 19, Johnson, in a conversation with the UCA, indicated the "**Cloyd** did not provide Johnson with any of the proceeds from the sale of the MCD to the UCA."  Thus, once again, it is established that **Cloyd** controlled the money and had the ability to and, in fact, did set the price for the MCDs.

Subsequently, on August 5, 2023, the UCA contacted **Cloyd** and Johnson.  Johnson told the UCA that he would have to call **Cloyd**.  While Johnson referred to **Cloyd** as "his associate" the fact is that **Cloyd** subsequently called the UCA, exchanged text messages with him, and agreed again on a price in connection with the sale of an MCD.  Specifically, the price would be $300.00.  **Cloyd** also advised that his girlfriend, Paris Brown, was traveling to the meeting

2

location and that she would be in a white KIA sedan.  Thus, **Cloyd** was controlling the delivery of the MCD to the UCA and using his "girlfriend" in that regard.

Subsequently, Brown, the girlfriend, called the UCA and stated that she was at the meeting location.  UCA observed Brown with a small object in her right hand.  Brown delivered the MCD to the UCA for $300.00 – the amount that **Cloyd** had agreed with the UCA would be the price.  **Cloyd**, during that transaction, was on FaceTime with Brown.

Shortly after the transaction **Cloyd** called the UCA.  The UCA indicated to **Cloyd** that he wanted larger quantities of MCDs.  According to the audio, **Cloyd** indicated that he would have to communicate with his sources in Texas but that "it would not be an issue to obtain larger quantities."  **Cloyd** also told the UCA, on inquiry, "he had the ability to obtain controlled substances and that he sold powder Cocaine and crack Cocaine."

It is correct that the Facebook accounts of Johnson, **Cloyd**, and Brown all show images with MCDs.

The fact is that **Cloyd** was the common link between the activity in Count 1 and the activity in Count 2.  **Cloyd** appears to have been, and the evidence supports the proposition, "the supplier."  In fact, **Cloyd** indicates as much in conversations with the UCA.

## II.   DID CLOYD ACCEPT RESPONSIBILITY?

The question then arises, was **Cloyd** honest in his "acceptance of responsibility" statement in paragraph 29.

The evidence supports the proposition, by the greater weight or preponderance of the evidence, that **Cloyd** was not honest in his statement.  He admits to having been in Texas but indicates that he came to Memphis to visit family.  He says that someone asked him to drop off something while he was at a restaurant (Bones Wings) and then says "I apologize for dropping it off and not knowing what I was doing."  This appears to be far from the truth.  **Cloyd** had the operative conversations, controlled the items that were being sold, retained all the proceeds from the first sale for himself (according to Johnson) and offered to sell not only additional "switches" to the UCA but other items.

In a second transaction, **Cloyd** attempts to blame Paris Brown, his girlfriend (or ex-girlfriend) and attempts to claim that someone else asked Ms. Brown to drop "it off and give it to someone else."  The evidence, however, supports the proposition that **Cloyd** was the price setter, the money collector, and the illegal device provider.

Therefore, far from accepting responsibility, **Cloyd** appears to be pointing at everyone else while, in fact, the preponderance of the evidence supports the proposition that **Cloyd** set the details of each transaction, controlled the items being sold and received the proceeds of the transactions.

3

       The Court finds that **Cloyd** has made materially false statements to the Court and that his recorded telephone conversations as evidenced by Exhibit _____ (the audio tapes) and the undisputed facts in the Pre-Sentence Report are what should be relied on in determining the facts relevant to sentencing in this case. The Court has listened to the recorded conversations and they support the factual conclusion as set out above.

### III.    DID CLOYD OBSTRUCT JUSTICE?

Based on **Cloyd's** conduct, and in accordance with 3C1.1, Application Note 4 (H), a two-level enhancement for obstructing or impeding the administration of justice may be appropriate.

### IV.    WAS CLOYD A SUPERVISOR (§ 3B1.1(c))?

**Cloyd,** based on the evidence, has been shown by a preponderance of the evidence to at least have supervised Brown. A two-point enhancement under 3B1.1(c) may be appropriate.

       **SO ORDERED**, this 9th day of January, 2024.

                                    /s/ Jon P. McCalla
                                    JON P. McCALLA
                                    UNITED STATES DISTRICT JUDGE